## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

266 SUMMIT, LLC,

        Plaintiff,

v.

                                 **MEMORANDUM OF LAW & ORDER**
                                 Civil File No. 10-4051 (MJD/JSM)

LAWYERS TITLE INSURANCE
CORPORATION,

        Defendant.

Charles R. Alden & Kevin R. Coan, Hinshaw & Culbertson LLP, Counsel for Plaintiff.

James M. Lockhart & Jessica L. Meyer, Lindquist & Vennum P.L.L.P., Counsel for Defendant.

## I.  INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [Docket No. 13].  The Court heard oral argument on June 3, 2011.  The Court grants Defendant's motion.  Lawyers Title owed no duty to defend Summit in the Mesaba or Prokosch actions or prosecute the Mesaba eviction action, and thus, that it properly denied coverage in each of the three actions.

1

Moreover, Summit failed to point to evidence of any specific misrepresentation by Lawyers Title made before Summit purchased the title insurance.

## II.    FACTUAL BACKGROUND

This matter arises from a series of transactions relating to the sale and ownership of certain real property located at 266 Summit Avenue, St. Paul, Minnesota (the "Property").  Plaintiff 266 Summit, LLC ("Summit") was organized as a Minnesota limited liability company on July 20, 2008, for the sole purpose of purchasing the Property from Mesaba Finance-Summit, LLC ("Mesaba"), a company owned by Mark Erjavec.  Summit is wholly owned by Edgebrook, Inc. ("Edgebrook").  Craig Oberlander is the CEO of Edgebrook and the chief manager of Summit; there are no other officers or directors of Summit.

### A.    Summit's Purchase of the Property

On July, 31, 2008, Summit entered into a purchase agreement for the purchase of the Property from Mesaba for a price of $1.3 million along with $200,000 for the fixtures, furniture and equipment located at the Property.  The closing took place the same day and was handled by Wendy Ethen of Guaranty Commercial Title ("Guaranty Title"), which was, at the time, an agent of

2

Defendant Lawyer's Title Insurance Corporation ("Lawyers Title").  No one from Summit attended the closing.  The transaction was financed by cash payment, an assignment of the mortgages on another property, and Craig Oberlander's personal line of credit at Crown Bank.

As part of the transaction, Summit gave Mesaba an 18-month option to purchase all of the membership interests in Summit for between $1.555 and $1.7 million, depending on when the option was exercised.  The purchase agreement also gave Mesaba the non-exclusive "right to reside in the property for a period of 12 months."  (July 2008 Purchase Agreement ¶ 6.)  Mesaba delivered a warranty deed for the Property to Summit.

Summit claims that it understood Mesaba to be the owner of the Property while the parties were negotiating a sale, but, in fact, Mesaba did not actually purchase the Property from its previous owners, Ronald and Kathleen Prokosch, until July 31, 2008, the same day it sold the Property to Summit.  Guaranty Title also performed the Mesaba-Prokosch closing.  Mesaba purchased the Property for $1.3 million from the Prokosches.

**B.**    **Summit's Purchase of Title Insurance**

Summit purchased a title insurance policy ("Policy") with limits of $1.3 million through Guaranty Title, which was issued by Lawyers Title.  According to Lawyers Title and the Policy itself, August 8, 2008, was the effective date of the Policy.  Summit points out that the Policy lists a November 4, 2008, mortgage in its Schedule B Exceptions from Coverage.

Craig Oberlander claims that, over the twenty years he had done business with Lawyer's Title, he was "familiar with [Lawyers Title's] website" and had "looked at a lot of marketing material from Lawyers Title," while at the same time, he admits that he "didn't necessarily choose [Lawyers Title]" as an insurer. (Craig Oberlander Dep. 66-68.)  Oberlander admits that Ethen did not provide him with quotes or information on other title insurers; rather, Lawyers Title was simply the title insurer for which Guaranty Title wrote title insurance.  In general, Oberlander claims that he "relied on Lawyers Title to do what they purport to do, which is protect buyers and lenders against unrecorded defects and hidden risks and unrecorded liens and mortgages and other defects of title." (Id. 67.)

The only evidence in the record of advertising or marketing by Lawyers Title is a selection of pages from its website (copyright 2009) as they existed on August 23, 2010.  There is no evidence in the record as to what Lawyers Title's website stated in 2008 – when Summit purchased title insurance – or earlier.

## C.    The Mesaba Action

Following the sale of the Property, Mesaba continued to occupy the Property for 12 months.  Mesaba then continued to occupy the Property for an additional 6 months with Summit's consent.  In January 2010, when Mesaba's 18-month Option Agreement was about to expire, Mesaba requested an extension of its right to occupy the Property as well as its rights under the Option Agreement. The parties were unable to agree on the terms of an extension.

On February 15, 2010, Mesaba commenced a complaint against Summit, Ronald Prokosch, and Crown Bank, captioned <u>Mesaba Finance-Summit, LLC v. 266 Summit, LLC, et al.</u>, Ramsey County District Court (the "Mesaba Action"). Mesaba sought:

> a declaratory judgment determining that Mesaba is the fee simple absolute owner of the Property subject to an equitable mortgage in favor of 266 Summit, LLC and determining the exact nature and

relative priority of the claims or interests in the Property held by the other defendants, if any.

(Mesaba Action Compl. ¶ 23.)  In its complaint, Mesaba described the facts as follows:

> On July 31, 2008, Prokosch executed and delivered a deed to the Property to Mesaba in consideration for payment of a purchase price paid with money loaned to Mesaba by 266 Summit, LLC, and other valuable consideration.

> On July 31, 2008, Mesaba executed and delivered a deed to the Property and an option to purchase the Property agreement to 266 Summit, LLC in consideration for the loan from 266 Summit, LLC which enabled Mesaba to purchase the Property from Prokosch.

> ***

> The parties to the July 31, 2008 transactions involving the Property at all times intended that the transaction between Mesaba and 266 Summit, LLC was a secured financing transaction under which Mesaba was the owner of the Property and 266 Summit, LLC was a lender and that the Property would serve as security for Mesaba's obligation to repay the loan memorialized in the form of the option to purchase agreement.

(Id. ¶ 12-13, 15.)  Mesaba went on to allege that the "documentation of the July 31, 2008 transactions between the parties was intended by 266 Summit, LLC, to deprive Mesaba of its rights of continued possession and equitable or statutory redemption under Minnesota mortgage foreclosure law in the event of a default

6

under the mortgage loan agreement between the parties."  (<u>Id.</u> ¶ 16.)  Finally,

Mesaba asserted that the "deed-option to purchase arrangements required by 266

Summit, LLC, disguised the true nature of the parties' real estate financing

transaction and mortgagee/mortgagor relationship in order to deprive Mesaba of

certain valuable property interests in the Property."  (<u>Id.</u> ¶ 19.)

On February 19, 2010, Ethen tendered the Mesaba Action to Lawyers Title

on behalf of Summit.  On March 31, 2010, Lawyers Title denied coverage for the

Mesaba Action on three grounds, including Policy Exclusion 3(a) for "loss or

damage, costs, attorneys' fees, or expenses that arise by reason of . . . [d]efects,

liens, encumbrances, adverse claims, or other matters (a) created, suffered,

assumed, or agreed to by the Insured Claimant."

### D.     The Mesaba Eviction Action

On February 25, 2010, while waiting for a coverage decision in regards to

the Mesaba Action, Summit filed an eviction action against Mesaba and Erjavec,

captioned <u>266 Summit, LLC v. Mesaba Finance-Summit, LLC, et al.</u>, Ramsey

County District Court ("Eviction Action").  Summit asserted that, although

Mesaba and Erjavec had been permitted under contract to occupy the Property,

7

their right to occupy the Property had expired, and they were in possession of

the Property without legal interest.

### E.      Settlement of the Mesaba Action and the Eviction Action

Summit entered into a Settlement and Mutual Release Agreement with

Mesaba on April 22, 2010, settling both the Mesaba Action and the Eviction

Action.  According to the Stipulated Settlement, Mesaba and Erjavec agreed to

"quit claim and disclaim any and all ownership rights in or to the [Property],"

and agreed that they had "no legal or equitable ownership in the [Property]."

(Stipulated Settlement ¶ 7.)  Further, Mesaba agreed to vacate the Property no

later than July 8, 2010.  Summit incurred no liability or damages as part of the

settlement.  Summit incurred approximately $35,000 in legal fees and expenses in

defending the Mesaba Action.

### F.      The Prokosch Action

On April 26, 2010, Ronald Prokosch initiated a lawsuit against Craig

Oberlander, Ryan Oberlander, and Summit, captioned <u>Prokosch v. Oberlander,</u>

<u>et al.</u>, Ramsey County District Court (the "Prokosch Action").  In the complaint,

Prokosch asserted an interest in the Property based on an equitable mortgage and mortgage fraud.

According to Prokosch, he decided to personally finance Erjavec and Mesaba's purchase of the Property from Prokosch.  Prokosch claimed to understand the transactions with Mesaba to be secured financing transactions under which Mesaba was the owner and Prokosch was the lender, with the Property serving as security, but the mortgages in favor of Prokosch were never properly recorded.  Instead, according to the Prokosch complaint, Summit recorded a $1.5 million mortgage on the Property even though it only loaned Erjavec $1 million, and Erjavec improperly recorded the Prokosch mortgage in favor of Summit.

Ultimately, Prokosch alleged that the transactions between Summit and Mesaba were

> intended by Defendants to deprive Plaintiffs of their seniority of the mortgages, and supplant that seniority with their own claim to the Property by deeming the transaction a 'deed/option to purchase agreement' between Mesaba and Defendants.  Defendants constructed and executed those documents to improperly give the appearance that their mortgages were senior, and fraudulently recorded their documents with improper amounts and inaccurate

9

> party names for the purposes of ensuring a primary claim on the property, to which they never had a claim to begin with.

(Prokosch Compl. ¶ 27.)  Prokosch sought a declaratory judgment determining Mesaba to be the equitable owner of the property and Prokosch to be an equitable mortgagee, and further determining that any other interests are junior and subordinate to Prokosch's mortgage interest.  Prokosch also alleged that the Oberlanders and Summit knew about prior mortgages between Prokosch and Erjavec and that they fraudulently executed a subsequent loan to Erjavec and claimed the loan was a mortgage.  Prokosch further asserted that "Defendants caused loan documents to be falsely recorded . . . intentionally misrepresented the amount owing on the loan, and intentionally replaced Prokosch's name on the $900,000 mortgage document with their own."  (Id. ¶ 37.)

On May 18, 2010, Ethen tendered the Prokosch Action to Lawyers Title on behalf of Summit.  In a May 24, 2010 letter, Lawyers Title denied the claim on two grounds, including Exclusion 3(a).

As with the Mesaba Action, Summit hired its own attorney to defend and resolve the Prokosch Action.  Prokosch eventually settled and dismissed the case.

Summit incurred no liability or damages.  Summit incurred approximately

$55,000 in legal fees and expenses in defending the Prokosch Claim.

## III.    PROCEDURAL BACKGROUND

On August 25, 2010, Summit initiated a Complaint against Lawyers Title in

Ramsey County District Court, alleging: Count One: Breach of Contract, based

on Lawyers Title's refusal to defend and indemnify it in connection with the

Mesaba and Prokosch Actions and for refusing to prosecute the Eviction Action;

Count Two: Bad Faith Denial, for acting in bad faith in its refusal to defend and

indemnify Summit; Count Three: Consumer Fraud – Violations of Minn. Stat. §

325F.69; and Count Four: False Advertising – Violation of Minn. Stat. §325F.67.

On September 24, 2010, Lawyers Title removed the case to this Court based

on diversity jurisdiction.  Lawyers Title filed this Motion for Summary Judgment

seeking dismissal of all four counts in Summit's complaint.

## IV.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of</u>

<u>Minneapolis</u>, --- F.3d ----, 2011 WL 2610749, at *4 (8th Cir. 2011) (citing <u>Anderson</u>

<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

### B.    Title Insurance and the Duty to Defend

"Interpretation of an insurance policy, and its application to the facts of the

case, are questions of law."  <u>Franklin v. W. Nat'l Mut. Ins. Co.</u>, 574 N.W.2d 405,

406 (Minn. 1998).  "The existence of a legal duty to defend or indemnify is also a

legal question . . . ."  <u>Id.</u>

Generally, "parties are free to define the exact scope of the policy's

coverage and may specify the losses or encumbrances the policy is intended to

encompass."  <u>Brown v. St. Paul Title Ins. Corp.</u>, 634 F.2d 1103, 1107 (8th Cir. 1980)

(citation omitted).  However, "[b]ecause most insurance policies are preprinted

forms drafted solely by insurance companies—basically contracts of adhesion—policy words of inclusion will be broadly construed, and words of exclusion are narrowly considered." <u>Gen. Cas. Co. of Wis. v. Wazniak Travel, Inc.</u>, 762 N.W.2d 572, 575 (Minn. 2009) (citations omitted).  Unambiguous words are given their "plain, ordinary, and popular meaning." <u>Id.</u> (citation omitted).  If terms are ambiguous and reasonably susceptible to more than one interpretation, they will be construed against the insurer and interpreted liberally in favor of finding coverage. <u>Id.</u>

> Title insurance is intended to protect against all loss or damage which the insured sustains by reason of "(1) existing defects in, or unmarketability of title . . .; (2) leases and encumbrances changing the same as of the date of the policy; (3) defects in title of a mortgagor to the mortgaged estate, or mortgaged interest.

<u>Evelyn I. Rechtzigel Trust v. Fidelity Nat'l Title Ins. Co. of N.Y.</u>, 748 N.W.2d 312, 316 (Minn. Ct. App. 2008).  "The risk of coverage is retrospective; only the discovery of the defect is usually prospective." <u>Id.</u> at 320.

Here, Summit sustained no loss to be indemnified; therefore, only Lawyers Title's duty to defend is at issue.  "An insurer's duty to defend is distinct from and broader in scope than the duty to indemnify." <u>Franklin</u>, 574 N.W.2d at 406.

> The duty to defend is broader than the duty to indemnify in three ways: (1) the duty to defend extends to every claim that "arguably" falls within the scope of coverage; (2) the duty to defend one claim creates a duty to defend all claims; and (3) the duty to defend exists regardless of the merits of the underlying claims.

Wooddale Builders, Inc. v. Md. Cas. Co., 722 N.W.2d 283, 302 (Minn. 2006) (citation omitted).  The insurer bears the burden of demonstrating that all parts of the action clearly fall outside the scope of coverage.  Franklin, 547 N.W.2d at 407.

"Where the pleadings do not raise a claim arguably within the scope of coverage, the insurer has no duty to defend or investigate further to determine whether there are other facts present which trigger such a duty." Garvis v. Employers Mut. Cas. Co., 497 N.W.2d 254, 258 (Minn. 1993) (citations omitted).

> Of course, if the insurer is aware of facts indicating that there may be a claim, either from what is said directly or inferentially in the complaint, or if the insured tells the insurer of such facts, or if the insurer has some independent knowledge of such facts, then the insurer must either accept tender of the defense or further investigate the potential claim.

Id. (citation omitted).

### C.    Plaintiff's Breach of Contract Claim

14

Lawyers Title is entitled to summary judgment on Summit's breach of

contract claim because it owed no duty to defend Summit in the Mesaba or

Prokosch Actions or prosecute the Eviction Action, and thus, it properly denied

coverage and refused to provide legal representation in each of the three actions.

### 1.      Application of the Policy Exclusions in General

Before considering the parties' arguments with regard to Lawyers Title's

duty to defend, the Court must address whether the exceptions and exclusions

upon which Lawyers Title depends should be considered at all.

Summit asserts that there is at least a genuine issue of material fact as to

whether it was aware that the relevant exceptions and exclusions would apply to

its Policy.  Summit notes that Schedule B of the Policy contains an exception of a

November 4, 2008, mortgage from coverage even though the date of the Policy is

August 8, 2008.  Summit concludes that the Policy must have been first issued or

changed after the effective date.  Summit then points to a line of cases holding

that, if an insurer substantially reduces already existing insurance coverage

through an endorsement or policy renewal, if the insurer does not notify the

insured in writing of the reduction, the reduction is void.  See Canadian

Universal Ins. Co., Ltd. v. Fire Watch, Inc., 258 N.W.2d 570, 575 (Minn. 1977).

Summit's Policy was issued on a standard American Land Title

Association form, and the relevant exclusion that precludes coverage in this case

– Exclusion 3(a) – was included in the standard form Exclusions from Coverage;

it was not included in Schedule B.  "[E]xclusions within an insurance policy are

as much a part of the contract as the policy's other provisions, and they must be

given the same consideration in determining the extent of the policy's coverage."

Sphere Drake Ins. PLC v. Trisko, 24 F. Supp. 2d 985, 992 (D. Minn. 1998).   The

Court cannot apply the coverage that Plaintiffs seeks from the standard form

Policy while ignoring the exclusions included within that same standard form

Policy.

In any case, even if there is a genuine question of fact regarding whether

the Schedule B list of Exceptions from Coverage was added later, potentially

voiding Schedule B, this question has no effect on the exclusion for adverse

claims created by the insured found in the Exclusions from Coverage 3(a).  The

Court does not rely on any exception contained in Schedule B.  There is no

allegation or evidence that the Exclusions from Coverage portion of the Policy was added to the Policy later, reducing the scope of coverage provided to Plaintiff in some earlier policy.  This is not a renewal case or a case involving a reduction in coverage.  The Court is interpreting the coverage as provided by the original, standard-form Policy.  Therefore, <u>Canadian Universal</u> is not applicable.

There is no basis for the Court to disregard Exclusion 3(a).  And, as the Court will explain, that exclusion negates coverage for the actions filed against Summit.

### 2.      Duty to Defend the Mesaba Declaratory Judgment Action

Lawyers Title owed no duty to defend Summit in the Mesaba Action because Mesaba's complaint was predicated on Summit's alleged deliberate, wrongful conduct.  The Policy excludes from coverage "adverse claims . . . created, suffered, assumed, or agreed to by the insured claimant."  This Court recently considered a similar exclusion in a title insurance policy in <u>Ketterling v. Chicago Title Ins. Co.</u>, Civil No. 09-1776 (MJD/JJK), 2010 WL 3926254 (D. Minn. Oct. 1, 2010).  Similar to the Policy at issue in this case, the policy in <u>Ketterling</u> excluded risks "created, allowed, or agreed to by You."  <u>Id.</u> at *2.  The Court held

that, "[b]ecause the [adverse] action was based on claims that the [insured]

obtained title to the property through fraudulent means and

misrepresentations," the policy language excluded coverage in that case.  Id. at

*4.

        "The coverage issue is determined by the policy language compared to the

claims asserted in the underlying action.  It is of no consequence if the insured

successfully defends."  Id. (citing Mattson v. St. Paul Title Co. of the S., 641

S.W.2d 16, 18 (Ark. 1982)).   A title insurer does not have an obligation to provide

a defense to its insured when the action is based on the allegation that the

insured acquired title by the insured's deliberate wrongdoing.  See, e.g.,

Ketterling, 2010 WL 3926254, at *2; Carefree Living of Am. (Minnetonka), Inc. v.

Chicago Title Ins., No. C4-99-1651, 2000 WL 290411, at *1 (Minn. Ct. App. Mar.

21, 2000) (unpublished).

        In its complaint, Mesaba asserted that "[t]he documentation of the July 31,

2008, transactions between the parties was intended by 266 Summit, LLC, to

deprive Mesaba of its rights of continued possession and equitable or statutory

redemption under Minnesota mortgage foreclosure law in the event of a default

18

under the mortgage loan agreement between the parties." (Mesaba Action

Compl. ¶ 16.) Mesaba further alleged that "[t]he deed-option to purchase

arrangements required by 266 Summit, LLC, disguised the true nature of the

parties' real estate financing transaction and mortgagee/mortgagor relationship

in order to deprive Mesaba of certain valuable property interests in the

property." (Id. ¶ 19.) In other words, Mesaba alleged that Summit engaged in

intentional wrongful conduct and made misrepresentations that altered the

nature of the transaction between the parties. Mesaba asserted that the title issue

between the two parties was deliberately created by Summit. Under Exclusion

3(a), Lawyers Title had no duty to defend.

### 3.     Duty to Defend the Prokosch Declaratory Judgment Action

Similarly, Lawyers Title owed no duty to defend Summit in the Prokosch

Action under Exclusion 3(a) because the Prokosch action was predicated entirely

on alleged deliberately wrongful conduct by Summit.

The Prokosch complaint alleged that the transaction between Summit and

Mesaba

> [w]as intended by Defendants to deprive [Prokosch] of [his]
> seniority of the mortgages, and supplant that seniority with their

> own claim to the Property. . . .  Defendants constructed and executed
> those documents to improperly give the appearance that their
> mortgages were senior, and fraudulently recorded their documents
> with improper amounts and inaccurate party names for the
> purposes of ensuring a primary claim on the Property.

(Prokosch Action Compl. ¶ 27.)  The foregoing paragraph was realleged and

incorporated into Prokosch's equitable mortgage claim.  (Id. ¶ 28.)  In Prokosch's

mortgage fraud count, he further claimed that "Defendants caused loan

documents to be falsely recorded . . . intentionally misrepresented the amount

owing on the loan, and intentionally replaced Prokosch's name on the $900,000

mortgage document with their own."  (Id. ¶ 37.)  In other words, the claims

brought in the Prokosch Action were both premised on the alleged fraudulent

conduct of Summit and Craig and Ryan Oberlander.  Under Exclusion 3(a),

Lawyers Title had no duty to defend.

### 4.    Duty to Prosecute the Mesaba Eviction Action

There was no duty to prosecute the Eviction Action.  The Policy provides a

requirement that Lawyers Title defend the insured in certain actions, but there is

no corresponding requirement that it **prosecute** actions on behalf of the insured.

(Policy, Conditions ¶ 5.)  Rather, the Policy grants Lawyers Title the option to

pursue such actions if it so desires.  (<u>See</u> Conditions ¶ 5(b).)  An insurance policy's option to prosecute does not require the insurer to prosecute; nor does it require the insurer to pay for costs incurred by an insured that decides to initiate a lawsuit on its own.

### D.    Bad Faith and Punitive Damages Claims

Lawyers Title is entitled to summary judgment on Count Two, Summit's bad faith and punitive damages claim.  Summit alleges in its complaint that Lawyers Title acted in bad faith when it "violated its duties under the Policy." (Compl. ¶ 49.)  As the Court has explained, Lawyers Title did not violate the Policy by refusing to defend the Mesaba and Prokosch Actions and refusing to prosecute the Eviction Action.

Additionally, to the extent that Summit seeks punitive damages, it has failed to meet the procedural requirements for seeking to amend the complaint to assert that claim.  <u>See</u> Minn. Stat. § 549.191; <u>McKenzie v. N. States Power Co.</u>, 440 N.W.2d 183, 184 (Minn. Ct. App. 1989).  Summit's bad faith claim also fails under common law because it is merely a recharacterization of its breach of contract claim and does not allege any independent tortious conduct.  <u>See</u> <u>Markgraf v.</u>

Douglas Corp., 468 N.W.2d 80, 83 (Minn. Ct. App. 1991) (citation omitted).

Summit's statutory bad faith claim also fails because no motion was ever made to

amend the complaint in compliance with the Minnesota statutory requirements.

Minn. Stat. § 604.18, subd. 4.  Furthermore, the bad faith statute specifically

narrows the definition of insurance policy such that the statute does not apply to

a claim related solely to the duty to defend, as in this case.  See id., subd 1(a).

### E.   Summit's Consumer Fraud and False Advertisement Claims

Lawyers Title is entitled to summary judgment on Counts Three and Four,

Summit's consumer fraud and false advertising claims.  Minn. Stat. §§ 325F.67,

325F.69.  Summit alleges that Lawyers Title violated § 325F.69 by inducing

Summit to purchase Lawyers Title's Policy by engaging in the use of false or

misleading representations and statements regarding material facts, including

the degree of coverage afforded by the Policy.  Summit alleges that Lawyers Title

violated § 325F.67 by publishing false and misleading advertisements to induce

Summit and others to purchase title insurance policies from it.

Summit's claims fall short because Summit has failed to produce evidence

of any specific misrepresentation upon which its claims are based.  Summit "has

the burden of producing evidence of misrepresentation, and in the absence of such evidence [its] fraud claims must fail." Taylor Inv. Corp. v. Weil, 169 F. Supp. 2d 1046, 1062 (D. Minn. 2001). "Without specific evidence of an actual misrepresentation," claims for consumer fraud and false advertising "cannot survive summary judgment." Semanko v. Minn. Mut. Life Ins. Co., 168 F. Supp. 2d 997, 1001 (D. Minn. 2000).

Summit has failed to produce evidence of any specific misrepresentation by Lawyers Title made before Summit purchased the Policy at issue. Mere speculation or a general recollection that, over a twenty-year period, Craig Oberlander saw marketing materials and was aware of Lawyers Title's website are not enough to survive summary judgment. Summit has not submitted any evidence that the quotations from the 2010 Lawyers Title web site are the same as, or even similar to, the language that appeared in 2008, when Summit could have viewed the site before purchasing the Policy. There is simply no evidence that Plaintiff was aware of any particular false or misleading statement in 2008.

Lawyers Title is entitled to summary judgment on all four counts against it.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 13] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   July 22, 2011                    s/ Michael J. Davis
                                          Michael J. Davis
                                          Chief Judge
                                          United States District Court

24